**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GERALD DACHE and COMMON SENSE SOLUTIONS, LLC, | ) ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 22 C 4465 |
| | ) | |
| v. | ) | Hon. Virginia M. Kendall |
| | ) | |
| INFORMATION SYSTEMS AUDIT AND CONTROL ASSOCIATION, INC., et al., | ) ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On November 6, 2023, Plaintiffs Gerard Dache and Common Sense Solutions, LLC ("Plaintiffs") brought an Amended Complaint against Defendant Information Systems Audit and Control Association, Inc. ("ISACA") and individual ISACA Defendants David Samuelson, Ron Lear, Geoff Terrell, Katie Tarara, Zachary Boslett, and Alex Stall for claims arising under Section 2 of the Sherman Act, 15 U.S.C. § 2. (Dkt. 83). Plaintiffs also assert state law claims for wrongful termination and tortious interference with prospective economic advantage. (*Id.*) ISACA now moves to dismiss the Amended Complaint for failure to state a claim. (Dkt. 91). For the following reasons, the motion to dismiss [91] is granted.

## BACKGROUND

This case concerns an alleged monopoly in the software industry's standard setting body. ISACA controls and operates the Capability Maturity Model Integration ("CMMI"), a "best practices" model developed by Carnegie Mellon University and the Software Engineering Institute to inspect the processes used by developers when creating software. (Dkt. 83 ¶¶ 3, 6).

1

Appraisers[1] utilize CMMI to evaluate a software manufacturer's quality and capability in line with standards set by ISACA. (*Id.* at ¶ 7). Carnegie Mellon developed CMMI in the 1980s and 1990s for the United States Department of Defense to evaluate defense systems software manufacturers. (*Id.* at ¶ 6). Until 2016, Carnegie Mellon set standards for the industry and independent appraisers would inspect and certify the third-party software developers. (*Id.* at ¶ 7).

This system changed in 2016 when ISACA bought the CMMI rights from Carnegie Mellon. (*Id.* at ¶ 23). After the purchase, Plaintiffs allege that ISACA began (1) requiring all CMMI appraisers to pay "hefty" annual dues; (2) limiting the number of assessments each appraiser could conduct per year so as to require the purchase of more licenses and certifications; (3) setting both the CMMI standards and providing the licensing and certifications to evaluate if those standards have been met; (4) requiring appraisers and trainers attend expensive CMMI Institute conferences; (5) requiring appraisers and trainers to develop and maintain complex records for each appraisal conducted; and (6) refusing to deal with certain customers. (*Id.* ¶¶ 9, 20, 26–27, 48–49). For example, ISACA began charging fees for delivering the virtual training course ($250–$500) and downloading a PDF of the CMMI standards each year ($1,600–$8,000). (*Id.* at ¶ 38). ISACA also almost doubled the annual license fee. (*Id.*) The Amended Complaint alleges ISACA bought the CMMI rights knowing it "could highjack the independent process," "corner the market" and "earn massive profits by subverting the system." (*Id.* at ¶¶ 7–8). These actions resulted in ISACA generating over 11,000% higher net revenues. (*Id.* at ¶ 9).

Plaintiffs allege this conduct ultimately shows that ISACA "hold[s] and abuse[s]" a monopoly in the "CMMI appraisal and training licensing and certification" market. (*Id.* at ¶ 41). Plaintiffs define the relevant product market as "the market of CMMI appraisal and training

---

[1] The Amended Complaint uses the terms "assessor" and "appraiser" interchangeably. For consistency, the Court refers to both as "appraiser" throughout.

licenses and certifications in the United States," with its consumers as "professional appraisers and trainers." (*Id.* at ¶¶ 28–29). ISACA allegedly maintains this monopoly due to barriers to entry to the CMMI appraisal and training licensing and certification market. For example, the Amended Complaint states that the CMMI model was developed over two decades by Carnegie Mellon with financial support from the United States Department of Defense. (*Id.* at ¶¶ 43–44). Thus, no other competitor can reasonably achieve similar support to enter the market. (*Id.* at ¶ 42). Further, Plaintiffs allege "there simply is no similar certification or license" to conduct CMMI appraisals. (*Id.* at ¶ 31). Consequently, consumers have no ready substitute, as they "devote years to learning the CMMI Model." (*Id.* at ¶ 33).

Plaintiff Gerard Dache was a CMMI model consumer from June 28, 2005 through October 9, 2017. (*Id.* at ¶ 17). Dache held the CMMI license through Plaintiff Common Sense Solutions, LLC, his business that conducts third-party CMMI appraisals and training. (*Id.*) Common Sense Solutions and ISACA's predecessor-in-interest were parties to a License Agreement. (Dkt 92 at 2; *see* Dkt. 92-1). Dache alleges that ISACA unjustifiably terminated the License Agreement after he reported to ISACA instances of Chinese software companies falsifying data and sending threats in order to receive CMMI appraisals. (Dkt. 83 ¶¶ 11, 52). Dache alleges that rather than address these issues and face reduced income, ISACA terminated Plaintiffs' certification and license in October 2017. (*Id.* at ¶¶ 50, 53). After ISACA terminated Plaintiffs' certification and license, their revenue fell by two thirds. (*Id.* at ¶ 35).

In bringing their claims, Plaintiffs allege ISACA violated Section 2 of the Sherman Act, 15 U.S.C. § 2, through willfully acquiring and maintaining its monopoly. (*Id.* at ¶¶ 54–58). Further, they allege ISACA violated its agreement with Plaintiffs in violation of Illinois public policy and tortiously interfered with their potential business expectancy. (*Id.* at ¶¶ 59–71).

Plaintiffs initially filed this case on August 22, 2022. (Dkt. 1). After the Court dismissed the complaint without prejudice in June 2023, (Dkt. 70), Plaintiffs filed an Amended Complaint in November 2023, (Dkt. 83). ISACA now moves again to dismiss the Amended Complaint in full. (Dkt. 91).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A] plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend. Mut. Ins.*, 844 F.3d at 675). The Court "also consider[s] any documents attached to and integral to the complaint as part of the [plaintiff's] allegations." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 878 (7th Cir. 2022). Yet, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough. *Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 649 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). The complaint's factual content must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## DISCUSSION

As an initial matter, in their Response Plaintiffs agreed to dismiss the individual Defendants and Counts II and III. (Dkt. 97 at 6 n.2). The individual Defendants named are ISACA officers or managers. (Dkt. 83 ¶ 16). Accordingly, the Court dismisses Defendants David

4

Samuelson, Ron Lear, Geoff Terrell, Katie Tarara, Zachary Boslett, and Alex Stall, as well as the state law claims in Counts II and III with prejudice. The Court will consider Count I—which alleges a violation of Section 2 of the Sherman Act—below.

To state a claim of monopolization under Section 2, Plaintiffs must plead "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

## I. Possession of Monopoly Power

ISACA raises several arguments in favor of dismissing Plaintiffs' claims, many of which repeat arguments made in their first motion to dismiss. The Court granted ISACA's first motion to dismiss based on Plaintiffs' failure to plead sufficient facts alleging a relevant product market. (Dkt. 70 at 3–7; Dkt. 45 ¶¶ 22–23 ("Defendant ISACA has a monopoly in the CMMI Certification Business, marketing and selling products and services related to CMMI.")).

In their Amended Complaint, Plaintiffs similarly allege the relevant product market is "the market of CMMI appraisal and training licenses and certifications in the United States." (Dkt. 83 at ¶ 28). This market remains a thinly pled, single-product market that the Court took issue with in considering the previous motion to dismiss.

Section 2 of the Sherman Act requires a plaintiff to plead a relevant product and geographic market in which the alleged anticompetitive behavior occurred. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020). A relevant product market encompasses "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered" and the cross-elasticity demand of those products. *United*

*States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956); *see also Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020). Yet, "a manufacturer's own products do not [generally] comprise a relevant product market," nor does a company's natural monopoly over its own products. *Green Country Food Market, Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004); *see also E.I. du Pont*, 351 U.S. at 393 ("[The] power that . . . automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly . . . [otherwise] one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product."); *see also Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761–62 (7th Cir. 1996).

Even so, Plaintiffs attempt to state a "rare" single-product market by noting that a single product can be a relevant market "where there are no economic substitutes," *Elliott v. United Center*, 126 F.3d 1003, 1005 (7th Cir. 1997), or where "consumers are locked in to purchasing a future product or service," *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 386 F. Supp. 3d 926, 945 (N.D. Ill. 2019); (Dkt. 97 at 7); *see also Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 136 F. Supp. 3d 911, 917 (N.D. Ill. 2015), *aff'd*, 870 F.3d 682 (7th Cir. 2017); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 961 (N.D. Ill. 2018) ("In rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes." (quoting *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010))).

Plaintiffs' "locking in" theory fails because they do not allege a relevant aftermarket of complementary products they have been locked into. In their Response, Plaintiffs note that ISACA consumers "must pay tens of thousands of dollars" to enter the CMMI appraisal and

licensing certification market. Then, consumers are locked into "exorbitant fees" from ISACA for additional goods and services, including training courses, downloading the CMMI standards, and delivering the training courses. (Dkt. 97 at 7). Plaintiffs misapprehend this antitrust principle.

In general, "[f]irms with market power" cannot deal in complementary products "in ways that take advantages of customers' sunk costs." *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006). In a leading example, the Supreme Court found Kodak in violation of antitrust laws for "locking" customers into a secondary market of copier parts and service repairs. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). After having reached substantial sales on expensive copiers, Kodak then moved to claim all the repair work themselves. The Supreme Court found Kodak's "change in policy" deceived the customers after they had been locked into purchases of expensive copiers and allowed it to dominate the parts and service aftermarkets unlawfully.

Unlike *Kodak*, Plaintiffs do not allege a relevant aftermarket of CMMI training and downloading that ISACA now dominates. *See In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 WL 8190256, at *34 (N.D. Ill. Nov. 27, 2023) ("In a *Kodak*-type single brand aftermarket case, determining the relevant market focuses on the aftermarket."). Nor does the Amended Complaint allege that that the training courses and downloading of the CMMI Model standards are "complementary products." *See In re Dealer Mgmt.*, 313 F. Supp. at 962. Even drawing all reasonable inferences in their favor, the alleged goods and services Plaintiffs are "locked" into constitute just one product: the CMMI model. Tellingly, the services of training and downloading were never alleged to have been sold separately. *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 694–95 (9th Cir. 1998) (distinguishing *Kodak* in a single-product

case because "the Supreme Court declared that Kodak lost only if a trier of fact could find that service and parts are two distinct products" (cleaned up)). Thus, ISACA "cannot have or exploit monopoly in [an aftermarket] that does not exist." *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 277 (N.D. Ill. 2019).

Instead, here, the Amended Complaint alleges that Carnegie Mellon used to offer certain services in the CMMI model for free. Then, once ISACA bought the CMMI rights, they began charging fees for those services. This change in pricing policy is not the anticompetitive cornering of an aftermarket that *Kodak* envisioned, nor is it pled as one.

In any event, Plaintiffs have more success with pleading the CMMI is so unique as to have no economic substitutes. *See Maui Jim, Inc.*, 386 F. Supp. 3d at 945. In its previous Opinion, the Court noted that Plaintiffs, "fail to explain what the CMMI product is, why the product is useful, what market it operates in, what products might have reasonable interchangeability, and—if the relevant product is simply a company's own product." (Dkt. 70 at 4). On this attempt, however, Plaintiffs explain the CMMI model, and state there is "no substitute for ISACA's product" since there "simply is no similar certification or license." (Dkt. 83 ¶¶ 31, 40). They plead facts stating (1) the CMMI model was developed over twenty years to evaluate enterprise software and is the uniquely accepted standard for the United States Department of Defense; (2) consumers devote years to learning the CMMI Model; and (3) consumers cannot easily switch to another software assessment as the consumers and their customers are "tied" to the CMMI model system, shown by Dache's revenue falling by two thirds when ISACA terminated his license . (*Id.* at ¶¶ 33–35). Consumers have no "ab[ility] to move to a different appraisal process," (*Id.* at ¶ 35), presumably because there is no other one the Department of Defense accepts. Further, ISACA was able to raise prices to exorbitant levels

without losing demand. (*Id.* at ¶ 40); *see Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1071 (N.D. Ill. 2016).

Taking the facts in Plaintiff's favor, they show that the CMMI model product is unique such that there are no substitutes or economic substitutes. *See Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 2018 WL 3861575, at *4 (N.D. Ill. Aug. 14, 2018) (retaining single brand claim where plaintiff pled that customers cannot easily switch products, the products are unique, and the products cannot be substituted). Thus, though the complaint limits the relevant market to a "single brand, franchise, institution, or comparable entity that competes with potential substitutes," the Amended Complaint "contains sufficient factual allegations that make it plausible there is no substitute." *Maui Jim, Inc.*, 386 F. Supp. 3d at 945 (quoting *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *4 (N.D. Ill. Aug. 29, 2013)); *see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 902 (N.D. Ill. 2011) ("Market definition is a deeply fact-intensive inquiry, [so] courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

The Court notes that the Amended Complaint only barely scrapes by in this respect and whether the "CMMI appraisal and training licenses and certifications" market rather than a broader market of enterprise software assessments is appropriate remains and outstanding question. The Plaintiffs did not provide much of an attempt to define the cross-elasticities and possible bounds of the CMMI market. *See c.f. In re Deere & Co.*, 2023 WL 8190256 at *34 (retaining a Section 2 single-brand aftermarket claim where Plaintiff alleges market power in the primary market). Yet, the Court will not dwell further on the relevant market or existence of market power as it believes that Amended Complaint fails for a far more deleterious reason that

goes to the heart of the antitrust laws: Plaintiffs do not plead facts sufficient to infer ISACA engaged in any anticompetitive conduct.

## II. Anticompetitive Behavior

Fatal to Plaintiffs claims, the Amended Complaint does not plead facts sufficient to infer that ISACA engaged in anticompetitive conduct or willfully acquired or maintained a monopoly. In addition to showing the possession of monopoly power in the relevant market, a claim under Section 2 must also allege "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell Corp.*, 384 U.S. at 570–71.

The Amended Complaint contains only wholly conclusory facts to suggest ISACA obtained its market power by reason other than chance or business acumen in purchasing the CMMI rights. Plaintiffs contend that their allegations of ISACA's conduct post-acquisition of the CMMI rights—such as charging exorbitant fees—are not examples of anticompetitive conduct, but rather the "consequences of ISACA's anticompetitive conduct." (Dkt. 97 at 10). Thus, ISACA's alleged anticompetitive conduct was (1) buying the CMMI rights from Carnegie Mellon, and (2) terminating the Licensing Agreement with Plaintiffs, a consumer. Neither of these pass muster.

Willful acquisition of monopoly power requires intent, not "to obtain a monopoly or to capture an ongoing increase in market share," which is "the aim of every business endeavor," but rather intent to "maintain or achieve monopoly power by anticompetitive means." *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000); *Siva*, 418 F. Supp. 3d at 277 ("[A]n antitrust plaintiff must allege that the defendant sought or maintained monopoly power by way or some sort of 'anticompetitive conduct.'"). Phrased another way, the would-be monopolist must make

"use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor" through "exclusionary practices." *Kodak*, 504 U.S. at 482–83 (cleaned up); *Schor*, 457 F.3d at 610; *see also Ploss*, 197 F. Supp. at 1073 ("There are myriad examples of anticompetitive conduct, including refusal to deal with competitors, predatory pricing or bidding, or exclusive horizontal agreements (among competitors)." (first citing *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); then *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007); and then *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000))).

It is therefore clear that "simple possession of monopoly power, or the pursuit of it, is not in itself illegal." *Viamedia, Inc.*, 951 F.3d at 451. Plaintiffs' contention that ISACA's buying of the CMMI rights from Carnegie Mellon to willfully acquire a monopoly or to engage in anticompetitive conduct is wholly conclusory. *Oakland Police & Fire Ret. Sys.*, 861 F.3d at 649 ("[M]ere conclusory statements do not suffice." (quoting *Iqbal*, 556 U.S. at 678)). Further, ISACA's alleged refusal to deal with Plaintiffs is not anticompetitive nor does it bear any relation to ISACA's obtaining or maintaining of monopoly power. *See Frantzides v. Northshore Univ. HealthSystem Fac. Prac. Assocs., Inc.*, 787 F. Supp. 2d 725, 733 (N.D. Ill. 2011).

Plaintiffs allege that ISACA bought the CMMI rights knowing it "could highjack the independent process," "corner the market," and earn higher revenues. (Dkt. 83 ¶¶ 7–8). Plaintiffs do not tie this buying of CMMI rights to ISACA's exclusionary conduct in relation to any CMMI competitor. Nor do Plaintiffs plead any facts lending an inference that ISACA engaged in predatory pricing, refusal to deal with competitors, or other conduct intended to squeeze competitors out of the market. Rather, these facts lend themselves to the conclusion that

ISACA fell into its market power "as a consequence of a superior product, business acumen, or historic accident." *Grinnell Corp.*, 384 U.S. at 570–71.

Additionally, the CMMI model's development from the United States Department of Defense funding does not import any improper exclusionary practices onto ISACA. *See Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 326 F. Supp. 3d 602, 617 (N.D. Ill. 2018), *aff'd*, 929 F.3d 865 (7th Cir. 2019) (finding no willful acquisition of monopoly where defendant "simply accepted a monopoly that was made available to it by government entities"); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015) (reasoning that defendant "lawfully obtained" a monopoly through their contract with a government entity). The acceptance of a CMMI appraisal is mandated by third parties, such as the United States Department of Defense, not ISACA. *See Lazarou v. Am. Bd. of Psychiatry & Neurology*, 2023 WL 6461255, at *8 (N.D. Ill. Oct. 4, 2023). Further, though Plaintiffs claim there are high barriers to enter the CMMI Model market, "the existence of high barriers to entry has more to do with maintaining monopoly power than with obtaining it." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir. 1989).

As Plaintiffs do not plead facts to assert that ISACA obtained its monopoly unlawfully, ISACA is "well within its rights to charge a monopoly price for its certifications." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 580 (7th Cir. 2022). Though Plaintiffs allege ISACA's price increases is just a "consequence" of ISACA's anticompetitive conduct, the Court notes that Section 2 "does not prohibit an entity possessing market power from simply raising prices in order to increase revenues." *Endsley*, 230 F.3d at 283 (affirming dismissal where plaintiffs alleged the tollway engaged in anticompetitive conduct by "charging an arbitrary and unreasonable toll" to raise their revenue); *see also Trinko*, 540 U.S. at 407 (explaining that "[t]he

mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system")." In fact, a commonsense conclusion is that competition is *enhanced* by ISACA raising prices on the CMMI appraisals and trainings. *In re Deere & Co.*, 2023 WL 8190256, at *34 ("Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition." (citing *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014))). Lastly, as stated above *supra* p. 6, a natural monopoly a company has over its own product does not violate Section 2.

Further, ISACA's refusal to deal with Plaintiffs does not allege any anticompetitive or exclusionary conduct. In fact, the general rule is that even monopolists "are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Viamedia*, 951 F.3d at 454; *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *see also Sharif Pharmacy, Inc.*, 950 F.3d at 916. Plaintiffs do not allege that ISACA's termination of the License Agreement "is irrational but for an anticompetitive purpose." *Siva*, 418 F. Supp. 3d at 278 (citing *Viamedia*, 2017 WL 698681 at *3); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 377 (7th Cir. 1986) ("The essential feature of the refusal-to-deal cases—a monopoly supplier's discriminating against a customer because the customer has decided to compete with it—is missing here."). Plaintiffs were consumers of the CMMI model and used it in their third-party appraisal business. They were not alleged to be competitors, but rather whistleblowers regarding the Chinese software companies' improper conduct. Per the terms of the License Agreement, and the law, ISACA was free to decline to deal with the Plaintiffs. *Lab. One, Inc. v. Staff Mgmt. Sols., LLC*, 2019 WL 3554412, at *4 (N.D. Ill. 2019) ("Labor One's allegations that Staff Management terminated . . . the parties' contract . . . do not

plead anticompetitive conduct."). Absent any other facts, the Court cannot conclude that ISACA engaged in anticompetitive conduct or willfully acquired or maintained a monopoly under Section 2. The Court grants ISACA's motion to dismiss Count I.

## CONCLUSION

The Court notes that Plaintiffs' allegations fail on an essential Section 2 element after two previous attempts at amendment. For the foregoing reasons, Defendant ISACA's motion to dismiss [91] is granted.

_____
Virginia M. Kendall
United States District Judge

Date: June 11, 2024